Willie E. WARREN, et al., Plaintiffs,

v.

CITY OF TAMPA, et al., Defendant.

No. 84–1477–CIV–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 8, 1988.

Kaydell O. Wright–Douglas, Tampa, Fla., William D. Wells, Pensacola, Fla., for plaintiffs.

Peter W. Zinober, Charles G. Burr, Zinober & Burr, Joseph G. Spicola, Jr., Stephen M. Bartas, Tampa, Fla., for defendants.

## ORDER APPROVING SETTLEMENT AGREEMENT AND CERTIFYING CLASS ACTION

KOVACHEVICH, District Judge.

This cause is before the Court on the parties' joint motion for class certification and approval of settlement agreement. The Court conducted a fairness hearing on March 28, 1988. Thereafter, the parties submitted demographic data, and affidavits from their respective expert witnesses, supporting their contention that the 4 single-member district—3 members at-large system of voting now utilized in the City of Tampa is a fair and reasonable system. Plaintiffs filed the depositions of Mr. Al Davis and Mr. Carl Warren. Both parties filed their post-fairness hearing memoranda on June 23, 1988.

## I. FACTS

The Court adopts the factual background set forth in Defendants' post-hearing memorandum, and reproduces it herein for ease of reference.

On May 26, 1980, a lawsuit was filed by Willie Warren and Carl Warren against the City of Tampa (hereinafter "the City") and Hillsborough County (hereinafter "the County") challenging the procedure by which all members of the City Council and the County Board of Commissioners were elected at-large (hereinafter *Warren I*). The plaintiffs alleged in *Warren I* that the City's and the County's at-large election systems violated the First, Fourteenth and Fifteenth Amendments of the United States Constitution, Sec. 2 of the Voting Rights Act, and 42 U.S.C. Sec. 1983.

On June 17, 1980, the plaintiffs moved to have *Warren I* certified as a class action under Fed.R.Civ.P. 23(b)(2) on behalf of approximately 30,000 registered black electors in the County and approximately 20,000 registered black electors in the City. The motion alleged that "the representative plaintiffs have the same interest as do other members of the class, that is, to enjoin the defendants' at-large election methods ... [and] the representative plaintiffs have no interest which is antagonistic to those of other members of the class ..." On June 24, 1981, District Judge Ben Krentzmen entered an Order in *Warren I* granting the plaintiffs' motion for class certification under Rule 23(b)(2). The class was defined as "all black citizens who are presently registered voters who are potentially eligible voters of the City of Tampa or of Hillsborough County." In his order, Judge Krentzmen found, *inter alia,* that the named plaintiffs would fairly and adequately represent the interest of the class.

In November, 1980, the NAACP Special Contribution Fund, through its General Counsel, filed an appearance on behalf of the plaintiffs. On February 9, 1981, Albert Davis was joined as an additional representative plaintiff.

During 1983, both the City and County altered the procedures by which members of the City Council and School Board of Commissioners, respectively, are elected. Specifically, on January 7, 1983, the City County passed an ordinance amending Tampa's Revised Charter by replacing the all at-large system with a system under which four City Council members would be elected from single-member districts and three members would be elected at-large (hereinafter "the City's 4–3 plan"). The City's 4–3 plan also required that the Chairman and Chairman Pro Tem of the City Council be elected from one of the three at-large districts. The amendment was submitted to the City's electors in a referendum held on March 1, 1983. The referendum was approved by a majority of the voters in 72 of the 75 election precincts.

On July 28, 1983, the County Commission adopted an ordinance providing that the number of County Commissioners would be increased from five to seven, with four Commissioners to be elected from single-member districts and three to be elected at-large (hereinafter "the County's 4–3 plan"). The County ordinance was approved by the County's electorate in a referendum held on September 20, 1983.

The City and the County submitted their respective 4–3 plans to the United States Department of Justice for preclearance under Section 5 of the Voting Rights Act. By letter dated January 3, 1984, the Department of Justice precleared the City's 4–3 plan. The Department of Justice initially objected to the County's 4–3 plan, resulting in this Court's issuance of temporary restraining orders prohibiting the scheduled primary and general elections of County Commissioners in September, 1984. However, on January 4, 1985, the Attorney General withdrew his objection and precleared the County's 4–3 plan.

On July 17, 1984, the City filed a motion to dismiss *Warren I* on the ground of mootness. The City argued that the replacement of the all at-large system with the City's 4–3 plan mooted the plaintiffs' claims against the City. On October 30, 1984, this Court granted the City's motion to dismiss. On February 22, 1985, the claims against the County were dismissed on similar grounds.

The instant lawsuit was filed against the City (but not against the County) on November 7, 1984 by Willie Warren, Carl Warren and Albert Davis on behalf of themselves and all other persons similarly situated (hereinafter *Warren II*). *Warren II* challenges the City's 4–3 plan for electing City Council members on essentially the same constitutional and statutory grounds as *Warren I.*

From the outset of *Warren II*, the plaintiffs have been represented by the NAACP Special Contribution Fund.

Discovery was conducted throughout 1985 and the first several months of 1986).

On April 3, 1986, the parties filed a joint stipulation and motion seeking to have *Warren II* administratively closed until after the scheduled election of City Council

members in March, 1987. On April 8, 1986, this Court entered an Order administratively closing the case. A joint press release issued by the parties contemporaneous with the closure stated that "the agreement to administratively close the litigation is being made to give the four-three plan an opportunity to produce, i.e., to provide the black community with a candidate responsive to their needs."

Elections for the City Council were held on March 3, 1987. Perry C. Harvey, Jr., a black, ran unopposed and was elected in District 5.

On June 12, 1987, the plaintiffs moved to reopen *Warren II*. This Court granted the plaintiffs' motion on June 16, 1987.

Between June and October, 1987, the parties were engaged in various disputes concerning discovery. The City moved to compel more complete answers to interrogatories and to compel the production of certain requested documents. Sanctions were ordered against the plaintiffs arising out of the discovery disputes. In October, 1987, the City's counsel took discovery depositions of two representative plaintiffs, Carl Warren and Albert Davis.

Beginning in late October, 1987, the parties commenced settlement negotiations. Numerous proposals and counter-proposals were transmitted between counsel for the City and the General Counsel's Office of the NAACP Special Contribution Fund. Finally, on January 22, 1988, the parties reached an agreement and executed a Settlement Agreement, a copy of which is attached hereto as "Exhibit A."

On February 4, 1988, the parties filed a joint motion seeking conditional certification of the plaintiff class and approval of a notice to class members. This Court granted the joint motion by Order dated February 5, 1988. Notice was published in accordance with the Order.

On March 28, 1988, this Court held a fairness hearing on the proposed settlement. Three members of the plaintiff class appeared at the fairness hearing to oppose approval of the proposed settlement. Two of the objectors, Warren Dawson and Ricky Williams, personally voiced their ob-

jections. The third objector, Patricia Pierce–Coleman, relied on the other two objectors to present her opposition.

At the conclusion of the fairness hearing, this Court directed the parties to file expert witness affidavits concerning the various electoral and demographic issues. This Court further instructed the parties to file post-hearing memoranda regarding the issues raised in the affidavits and to address the objectors' concerns about the adequacy and competence of the plaintiffs' counsel.

## II. CLASS ACTION SETTLEMENT

### A. *Terms of the Proposed Settlement.*

Under the terms of the proposed settlement, the plaintiffs, as individuals and class representatives, have agreed to have the instant action certified as a class action with respect to the constitutionality and statutory validity of the City's 4–3 plan. Then, if this Court approves the settlement agreement, the plaintiffs have agreed to dismiss the action with prejudice. In return, the City has agreed to submit a proposed ordinance to City Council which would amend the City's Revised Charter to permit any member of City Council to serve as Chairman and Chairman Pro–Tem. The City also has agreed to cooperate with the County Supervisor of Elections in developing and implementing programs to increase the participation of black electors in municipal elections.

### B. *Standards for Approval of the Proposed Settlement*

■ The Court initially recognizes the principle that settlements are highly favored in the law. *Miller v. Republic National Life Ins. Co.*, 559 F.2d 426 (5th Cir.1977). The Court is required to make a two part determination that: 1) there is no fraud or collusion in reaching the settlement, and 2) the settlement is fair, adequate and reasonable. *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir.1984); *Ruiz v. McKaskle*, 724 F.2d 1149 (5th Cir.1984); *Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977); *In Re Dennis Greenman Securities*

*Litigation,* 622 F.Supp. 1430 (S.D.Fla. 1985).

■ In assessing whether a proposed settlement is fair, adequate and reasonable, the Court will consider the following factors:

1) The likelihood of success at trial and potential recovery;

2) The complexity, expense, and duration of litigation;

3) The terms of the settlement;

4) The procedures afforded to notify the class members of the proposed settlement, and to allow them to present their views;

5) The judgment of experienced counsel for the Plaintiff class;

6) The substance and the amount of opposition to the settlement;

7) The stage of proceedings at which the settlement was achieved.

*See, In Re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 212 (5th Cir.1981); *Cotton,* 559 F.2d at 1330; *Greenman Securities Litigation,* 622 F.Supp. at 1434.

### 1) Absence of Collusion

■ There is no evidence in the record which would indicate that there was any collusion among the parties or their attorneys in arriving at the terms of the settlement. The record shows that the parties conducted discovery and negotiated the terms of settlement for an extended period of time. The Court presided at status conferences pursuant to Fed.R.Civ.P. 16, and observed the efforts of counsel to advance their respective positions. The Court finds the settlement was negotiated at arms length and without collusion.

### 2) Fairness, Adequacy and Reasonableness

#### a) *Likelihood of Success at Trial and Range of Potential Recovery*

The Court is required to independently analyze the facts and the law to evaluate the Plaintiffs' likelihood of success at trial and range of potential recovery. The issue of this case is whether the City's 4–3 plan denies black voters an opportunity equal to white voters to elect their preferred candidates and an equal opportunity to participate in the political process, in violation of Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. Section 1973.

Section 2 of the Voting Rights Act of 1965, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstances which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

In 1982, Congress amended Section 2 to make it clear that Plaintiffs need only demonstrate a discriminatory result emanating from an electoral mechanism, rather than a discriminatory intent. *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 2759, 92 L.Ed.2d 25 (1986); S.Rep. No. (hereinafter S.Rep.) 417, 97th Cong., 2d Sess. 28, *reprinted in* 1982 U.S.Code Cong. and Admin.News 177, 205.

The Court should consider the following factors in its evaluation of the totality of the circumstances, as suggested by the Senate Judiciary Report:

1. The extent of any history of official discrimination in the state or political subdivision that touched on the right of members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

*See,* S.Rep. at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 206–207. Additional factors which the Court should consider include:

8. Whether there is a significant lack of responsiveness to the particularized needs of blacks in Tampa; and

9. Whether the policy underlying the use of voting qualifications or prerequisites is tenuous.

█ Some factors carry more weight than others in the establishment of a vote dilution case. These are: 1) the extent to which minority candidates have been elected to public office; and 2) the extent to which elections in the political subdivision have been racially polarized.

█ A determination of whether legally significant voter polarization has occurred requires "discrete inquiries into minority and white voting practices" and a "searching practical evaluation of the 'past and present reality.'" *Thornburg* at 2769, 2779 (citations omitted). Impairment of the minority voters' ability to elect representatives of their choice will not be found absent the following circumstances (hereinafter the Thornburg test):

1. The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district. *Thornburg* at 2766.

2. The minority group must be able to show that it is politically cohesive. *Thornburg* at 2767.

3. The minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ... usually to defeat the minority's preferred candidate. *Thornburg* at 2767.

Based on the expert testimony in this case, the Court concludes that it is uncertain whether Plaintiffs could successfully meet the Thornburg threshhold. Defendants concede that the evidence shows that black voters are politically cohesive, but they contest the first and third conditions of the Thornburg test.

Plaintiffs submit that they would be able to demonstrate at trial that blacks in District 3 (67.8%) of "NAACP Plan '7–A'" and District 3 (62.2%) of "Loewen Plan A", meet the first prong of the Thornburg test, establishing that blacks are a geographically compact group, sufficient in numbers to constitute "a majority" in a single-member district, if drawn. Defendants respond that the "majority" referred to is a voting age majority, and Dr. Loewen has not provided figures as to the black voting age composition of the two districts in question. Defendants further point out that Dr.

Loewen's plan does not comply with his principles of "good districting" in that it disregards a natural boundary, fragments existing neighborhoods, results in an elongated and distorted district, and has two districts which exceed the ten percent population variation guideline.

Plaintiffs suggest that this Court should be willing to order into effect a remedial plan which would call for an increase in the number of council seats from seven to nine, should the Court find that black voting strength is diluted by the present 4–3 plan. Defendants argue that this approach is inappropriate, as the Plaintiffs are challenging a legislative plan, which is entitled to judicial deference. *Seastrunk v. Burns*, 772 F.2d 143, 154–55 (5th Cir.1985). Defendants contend that the City has a compelling interest in retaining the current size of the City Council, which it has utilized since 1945. There is nothing in the record to establish that any discriminatory reason caused the City to adopt a seven-member body.

Plaintiffs believe that they can demonstrate that bloc voting occurs in Tampa, according to Table 18 of "Racial Bloc Voting Analysis, Tampa" by James W. Loewen, at pp. 24–25. This would satisfy the latter two prerequisites of the Thornburg test. Plaintiffs concede that in the March 1, 1983 District 6 election, bloc voting did not occur, but at trial would seek to convince this Court that this was due to "special circumstances." In seeking approval of this settlement, Plaintiffs recognize the possibility that in ruling the Court could find that no bloc voting occurred in that election.

Plaintiffs have provided expert testimony in the form of two affidavits of Dr. James W. Loewen, "Racial Bloc Voting Analysis, Tampa," and "Tampa Redistricting Report." In his analysis of racial bloc voting, Dr. Loewen analyzed the racial composition of the precincts based on registration statistics and on turnout by race, computed the correlation coefficient between racial composition and electoral outcome, and performed ecological regression for all precincts. Dr. Loewen then confirmed the re-

gression analysis by performing overlapping percentages analysis. Dr. Loewen used all black-white contests in elections for mayor or city council in the City of Tampa for the last 15 years as his database. Dr. Loewen concluded that the statistics indicated high levels of racial bloc voting in the 1974, 1975, 1979, and 1987 elections, but not in the 1983 election, which he considers an aberration.

In the "Tampa Redistricting Report," Dr. Loewen evaluated the 4–3 plan pursuant to certain enumerated principles of good districting, using Tampa's 1985 Test Census. He concluded that two black-winnable districts that meet the one person/one vote requirement could be drawn, and devised a seven single-member district plan which he believes is much fairer than the proposed 4–3 plan. Dr. Loewen disputes the truth of Defendants' assertion that blacks are now dispersing throughout Tampa, but has not provided a report on socioeconomic statistics, referred to on p. 24 of "Tampa Redistricting Report", explaining the basis for his contention.

Defendants filed the affidavits of Dr. Susan A. MacManus and Dr. Charles S. Bullock. Dr. Bullock disagrees with Dr. Loewen's conclusion that Tampa's elections are racially polarized, finding that Dr. Loewen's concept of "disfranchisement" is flawed, and that Dr. Loewen's plan would result in disproportionate representation. Dr. MacManus asserts that a "mixed system" is a commonly used alternative to at-large or single-member-district systems throughout the United States, that it often results in higher levels of minority representation than the traditional systems it replaces, especially the longer it is in place and where the minority population is growing and dispersing. Dr. MacManus relies on the *Population and Housing Characteristics: A Comparative Analysis—1970– 1980–1985*, Tampa City Planning, December, 1986, pp. 20–31, to support her assertion that Tampa's black population is dispersing. Dr. MacManus concludes that the mixed system increases the number of council seats which can be captured and influenced by minorities, and enhances and protects the chances of electoral impact for

both geographically-dispersed and geographically-concentrated minority groups in triethnic communities. Dr. MacManus further argues that the mixed system promotes representation of both neighborhood and citywide concerns, operating like a bicameral legislative body and encouraging multi-racial coalition building among councilmembers.

As the Eleventh Circuit stated in *McCord v. City of Fort Lauderdale, Florida, et al.,* 787 F.2d 1528 (11th Cir.1986).

> When analyzing racial polarization in voting it is important to realize that no one statistical theory is appropriate in all vote dilution cases. Care must be taken to examine each case individually while keeping in mind the section 2 "totality of the circumstances" approach. Statistics can be very useful analytically but they also can be quite deceiving if applied narrowly and automatically without the proper scope.

*McCord* at 1532. In that case, plaintiffs had presented various statistical theories to establish racially polarized voting, but had relied principally on a bivariate regression statistical analysis. This bivariate analysis produces an $R^2$ coefficient which correlates the percentage of a particular racial group registered in a given precinct with the percentage of the precinct vote for the candidates of that racial group. The district court found that when "tested against some actual events and realities" the bivariate analysis was less useful than a multivariate analysis which examined the voting patterns in the context of a number of independent variables including incumbency of the candidate, campaign funds spent, newspaper endorsements, voter turnout either in the black or white community, the portion of the registered voters who were black, and the sex of the candidate. *McCord,* at 1532. The Eleventh Circuit cautioned against placing too much reliance solely on $R^2$ coefficients in ruling on the issue racially polarized voting, and upheld as not clearly erroneous the district court's findings.

Defendants argue that Plaintiffs' expert has failed to give the proper weight to the election of black candidates, the relative success that black voters have had in electing candidates of their choice, and the existence of other factors which indicate that the lack of success of several black candidates was not attributable to race. Defendants point out that of the 25 candidates who have won contested seats on the City Council between 1974 and 1987, 17 were the preferred candidate of the majority of black voters who cast a ballot in the decisive election, thus resulting in a success rate of 68%. Defendants further point out that of the elections involving black City Council candidates, between 1973 and the present, eight blacks have run in five contested elections for at-large seats on the City Council. Of these five races, one was won by a black candidate, yielding a success rate of 20% in contested elections. Defendants further suggest the available evidence establishes that the majority of blacks failed to support Davenport, Pierce–Coleman and Marshall in their respective elections for reasons other than vote dilution or any racial motivation.

Defendants have argued that the small data base available to the Court would properly allow the Court to consider other local elections involving black candidates in which Tampa electors had an opportunity to vote, if this case did proceed to trial. The stipulated data base does not include the results of those elections. Given this evidence, the outcome of a trial of this case is at best uncertain.

Defendants contend that the proposed Loewen plan would give black voters super-representation on the City Council. Recalling that Section 2 does not guarantee blacks the right to elect black candidates, but rather the opportunity to participate, the proposed plan would create two black districts of the seven single-member districts, guaranteeing blacks 28% of the seats on the Council. Based on the 1985 Test Census data, blacks comprise 23.9% of the total population, but only 20.0% of the voting age population of Tampa. Dr. Loewen estimated the total percentage of blacks to be 24.8% by excluding 3.5% of the City's population, since they fell into the "other" category.

While Section 2 specifically prohibits proportional representation, other courts have used proportionality as a rough indicator of whether a particular electoral system or remedy provides minorities with an equal opportunity to participate in the political process. *Collins v. City of Norfolk,* 679 F.Supp. 557, 581 (E.D.Va.1988); *Potter v. Washington,* 653 F.Supp. 121, 128 (N.D. Fla.1986).

Defendant contends that its 4–3 plan provides blacks with representation on the City Council in closer proportion to Tampa's black voting age population. It also provides blacks with the opportunity to significantly effect four members of the City Council, the one "safe" seat, and the three at-large seats. The plan proposed by Dr. Loewen would give blacks the opportunity to affect the outcome in only two City Council contests. Defendants assert the 4–3 plan is superior to the Loewen plan because blacks are dispersing in Tampa, moving from the two "safe" districts proposed by Dr. Loewen. The Court cannot evaluate this factual dispute without more evidence from Plaintiffs, thus adding to the uncertainty of the outcome of this case at trial.

In light of the above discussion, the Court concludes that there is substantial uncertainty as to whether Plaintiffs would prevail at trial, and this uncertainty militates in favor of accepting the settlement. If Plaintiffs did prevail, it is likely that the Court would order the seven single-member district plan. Court-ordered plans are held to stricter standards than legislative plans, and must ordinarily use all single member districts and achieve population equality with little more than *de minimus* variation. *Chapman v. Meier,* 420 U.S. 1, 26–7, 95 S.Ct. 751, 765–66, 42 L.Ed.2d 766 (1975).

b) *Complexity, Expense and Duration of Litigation*

The litigation of a vote dilution case is complex, and would require the presentation of a great amount of historical, socioeconomic and demographic evidence, as well as public records and documents establishing the City's record of its response to the needs of the minority population. The parties estimate that a trial of this case would take three weeks of Court time, and would costs hundreds of thousands of dollars in attorneys' fees, expert witness fees, and costs. These factors militate in favor of a decision to accept the proposed settlement.

c) *Terms of Settlement*

The Court has examined the terms of settlement. While Plaintiffs have not received the optimal relief, there appears to be a genuine *quid pro quo.* Each side is giving, and each side is receiving, something of value. Plaintiffs have proposed to dismiss their lawsuit in exchange for Defendants' promise to develop and implement several programs designed to increase black voter participation and to present an ordinance to the City Council that will allow the Chairman and Chairman Pro Tem to come from any district. If the ordinance passes in the City Council, Defendants will hold a referendum on the ordinance.

Plaintiffs have also challenged the provision of Section 3 of Ordinance No. 8148–A which requires the Chairman and Chairman Pro Tem to be selected from those councilpersons from at-large election districts. The parties agreed that no class would be certified as to this issue. If the proposed ordinance and referendum pass, Plaintiffs' concerns would be moot, and if unsuccessful, Plaintiffs will be free to further litigate this issue. The Court finds that the terms of settlement adequately protect the interests of each party.

d) *Procedures Afforded to Notify the Class Members of the Proposed Settlement, and to Allow Them to Present Their Views*

This Court authorized the parties to notify the class members through the publication of notices in the *Tampa Tribune* and the *Florida Sentinel–Bulletin.* The *Florida Sentinel–Bulletin* primarily serves Tampa's black community. The notices explained the nature of the lawsuit, the pro-

posed settlement, and notified class members of their opportunity to object. The notices were published for three consecutive weeks, and four weeks was allowed between the time of filing objections and the scheduled fairness hearing.

Three objections were filed. Counsel for the parties deposed the objectors to determine the basis of the objections. At the fairness hearing, the Court afforded a full opportunity for the substance of the objections to be presented, and counsel for the parties were required to address those objections in their post-hearing memoranda.

The Court finds that the procedure used to notify the class members was reasonably calculated to notify interested parties, and adequately provided the opportunity to be heard to any interested parties.

### e) The Judgment of Counsel for the Parties

Counsel for both parties are experienced in civil rights and voting rights litigation. Both counsel have voiced their beliefs that the proposed settlement is fair and adequate. Counsel for Plaintiff stated that "the Court would not be required to give [Plaintiffs] anything more than four-three" because of the black voting age population of Tampa, together with the fact that Defendant has agreed to seek amendment of the Chairman and Chairman Pro Tem provision of the Revised Charter.

The Court has read the depositions of Carl Warren and Al Davis, members of the Plaintiff class. Both seek total single-member districting, and their desire is at odds with the agreement of counsel for the Plaintiff class to seek approval of the 4–3 system. That decision affects each member of the class equally, and the record contains no allegation that the rights of a definable minority group are being sacrificed for the benefit of the majority.

The Court is affording great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation. Each has stated his belief that the proposed settlement is a fair compromise.

### f) Substance and Amount of Opposition

The Court has considered the substance and amount of opposition to the settlement. Only three class members raised objections to the proposed settlement. That number is a small percentage of the entire class. The objections were directed at the adequacy and fairness of the settlement terms, and to the adequacy of the representation afforded Plaintiff.

The Court has discussed the adequacy and fairness of the settlement terms at length above. In addition, as Plaintiffs point out, the concern that this settlement will "lock [blacks in Tampa] out of the Courthouse for all time" is misplaced in that the 1990 Census will give rise to new data on which a future class of voters may base their claim of dilution. Thus, the demographics and racial bloc voting analyses which are based on the 1980 Census data will be rendered obsolete.

The issue of adequacy of representation is addressed below.

### g) State of Proceedings at which Settlement was Achieved

This case commenced on November 5, 1984, and there was a period of administrative closure from April 8, 1986 through June 16, 1987. The Court encouraged the parties to direct their efforts toward settlement, as well as preparation for trial, following the period of administrative closure. The settlement of this action was proposed after a period of informal discovery, during which the Plaintiffs analyzed the relevant election returns and other information as to the City's responsiveness to the needs of the black community. The Court must consider whether sufficient discovery has been conducted by the parties to allow them to reach an informed evaluation of the relative merits of the case. Corrugated Paper, 643 F.2d at 211. Based on the expert testimony filed by Plaintiffs, and the deposition testimony of Al Davis and Carl Warren, the Court concludes that the parties conducted sufficient discovery.

## III. CLASS CERTIFICATION

■ Plaintiffs are pursuing this action on behalf of themselves and a class defined as all present and future black electors of the City, pursuant to Fed.R.Civ.P. 23(a). The issue on which class certification is sought is whether Ordinance No. 8148–A of the City is constitutional under the First, Fourteenth and Fifteenth Amendments to the Constitution of the United States and lawful under Section 2 of the Voting Rights Act and 42 U.S.C. Section 1983.

### A. *Requirements of Rule 23(a)*

Rule 23(a) provides:

(a) PREREQUISITES TO CLASS ACTION. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The Court finds that the requirements of Rule 23(a) are met. As to numerosity, there are approximately 21,700 members of the plaintiff class and an indeterminate number of future members. As to the requirement of a common question, Plaintiffs are challenging the election system utilized by the City since 1983 to elect City Council members. All electors use the same system, thus meeting the "common question" requirement. Further, Courts have often granted class action status in other similar cases. *See Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Hendrix v. Joseph*, 559 F.2d 1265, 1267 (5th Cir.1977); *Sierra v. El Paso Independent School District*, 591 F.Supp. 802, 803 (W.D.Tex.1984); *Dillard v. Crenshaw*, 649 F.Supp. 289, 291 (M.D. Ala.1986). The claims and defenses of the representative Plaintiffs meet the typicality requirement in that their claims all stem from a single event, the enactment of Ordinance 8148–A.

■ Rule 23(a)(4) requires the Court to determine whether the representative parties fairly and adequately protect the interests of the class as a whole. In making this determination, two guidelines are used: 1) absence of conflict of interest with the class as a whole, and 2) adequate prosecution of the lawsuit. *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975).

■ Conflicts pertaining to the specific issues being litigated will bar class certification. 1 Newberg, *Class Actions*, Sec. 3.25 (2d ed. 1985). The fact that there is disagreement between a representative plaintiff and other members of the plaintiff class as to the choice of relief or desirability of settlement does not preclude the representative plaintiff from fulfilling his statutory obligations to fairly and adequately protect the interest of the class. *Rodgers v. U.S. Steel Corp.*, 17 FEP Cases 1761 (W.D.Pa.1978) [available on WESTLAW, 1978 WL 124]. A plaintiff will not be disqualified from acting as a representative of the class in negotiating a settlement unless it appears that the settlement involves a sacrifice of the interest of some class members to those of other class members. *In Re Chicken Antitrust Litigation*, 669 F.2d 228, 237 (5th Cir.1982).

On the record before the Court, it does not appear that the proposed settlement involves the sacrifice of the interest of some class members to the competing interest of other class members.

■ As to the issue of adequate representation, the Court is required to examine the representative Plaintiffs' status and motives in filing suit, as well as the competence and experience of counsel. *In Re Plywood Antitrust Litigation*, 76 F.R.D. 570 (E.D.La.1976).

Plaintiff Carl Warren is a doctoral candidate in the political science department of the University of Florida, and is writing his dissertation on the impact of single-member elections in Florida. He began lobbying for single-member districts in Tampa's

municipal elections in 1975. Carl Warren was a party to the original lawsuit filed in 1980, and he has served as Chairman of the Charter Review Commission in Gainesville, Florida, where he was involved in implementing a "mixed" system for electing members of Gainesville's City Council. The Court is convinced that Carl Warren's status and motives in pursuing this action are appropriate.

Plaintiff Albert Davis received a bachelor's degree in political science from the University of South Florida in 1979. Since then, he has been involved in efforts to bring about some form of single-member district elections in City Council elections. Plaintiff has served on committees of the Florida NAACP chapter since 1980 and is a member of the Executive Committee of the Tampa chapter of the NAACP. The Court finds that the status and motive of Albert Davis in pursuing this action are appropriate.

Margrett Ford, staff attorney for the NAACP Special Contribution Fund, initially represented Plaintiffs. Later, Dennis Hayes and Edward Hailes, Jr. replaced Ms. Ford. General Counsel Grover Hankins participated in the settlement negotiations. Kaydell Wright–Douglas was local counsel throughout the litigation.

At the fairness hearing on March 28, 1988, an objection was raised as to the adequacy of representation because of the several motions to compel discovery, and for extension of time, which appear on the record, and the monetary sanctions which the Court has imposed against Plaintiffs. The objector stated that he believed the settlement was accepted by Plaintiffs' counsel in order to avoid payment of the sanctions.

The Court notes that discovery violations have occurred in this action. The Court also notes that all of Plaintiffs' counsel have considerable experience in voting rights litigation, and that the objector lacks such experience. In appearances before the Court, Plaintiffs' counsel has demonstrated competence. The Court believes that the members of the class have been adequately represented.

### B. *Requirements of Rule 23(b)*

Class certification is sought under Rule 23(b)(2), which applies to circumstances where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). According to the Advisory Committee Notes, Rule 23(b)(2) has special applicability to "various actions in the civil rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration."

Under Rule 23(b)(2), individual class members may not elect to opt out of the class. *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506–508 (5th Cir.1981). Thus, all members of the class are bound equally by the adjudication or settlement of such actions, even though individual members of the class may oppose either the conduct of the litigation or some aspect of a proposed settlement. *Rogers v. U.S. Steel Corp*, 17 FEP Cases at 1763. This feature prevents repetitious litigation over a single policy or event that may affect many individuals, and by the need to avoid conflicting remedial orders arising from the prosecution of multiple actions. *Luevano v. Campbell*, 93 F.R.D. 68, 86 (D.D.C.1981). After consideration of all requisite criteria, and the applicability of Rule 23(b)(2), the Court certifies the class action. Accordingly, it is

ORDERED that the class action is hereby certified as to the stipulated issue; it is further

ORDERED that the proposed settlement is approved.

"EXHIBIT A"

SETTLEMENT AGREEMENT

WHEREAS, on January 6, 1983, the City Council of the City of Tampa, Florida (hereinafter "the City") adopted Ordinance No. 8148–A (copy attached hereto as "Exhibit A"), which amended the City's Revised Charter to provide for the district election of four members of the City Council and the at-large election of three members of the City Council (hereinafter "the 4–3 Plan");  and

WHEREAS, the 4–3 Plan was approved by Mayor Bob Martinez on January 7, 1983 and subsequently was approved by the City's electors in a referendum held on March 1, 1983; and

WHEREAS, the 4–3 Plan became effective on March 1, 1983 upon certification of the referendum results;  and

WHEREAS, on January 3, 1984, the United States Department of Justice issued it preclearance of the 4–3 Plan under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c;  and

WHEREAS, on November 7, 1984, a civil action was filed by Willie E. Warren, Carl Warren and Albert Davis (hereinafter "the representative plaintiffs") in the United States District Court for the Middle District of Florida, Tampa Division, styled *Willie E. Warren et al. v. City of Tampa et al.* [693 F.Supp. 1051], Docket No. 84–1477–Civ–T–17 (hereinafter "the civil action"), challenging the 4–3 Plan under the First, Fourteenth and Fifteenth Amendments to the Constitution of the United States;  Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973;  and the Civil Rights Act of 1871, 42 U.S.C. § 1983;  and

WHEREAS, the civil action was filed by the representative plaintiffs on behalf of themselves and a class consisting of all present and future black electors in the City (hereinafter "the class");  and

WHEREAS, the City has denied that the 4–3 Plan results in the deprivation or dilution of the votes of black electors;  and

WHEREAS, an election for City Council members was held under the 4–3 Plan on March 3 1987, resulting in the election of a black candidate in City Council district 5;  and

WHEREAS, the representative plaintiffs and the City have analyzed the results of the March 3, 1987 City Council election and various other elections and have concluded that it is in the best interest of themselves and the members of the class that the civil action be resolved by an agreed upon settlement in order to avoid the costs, delays and uncertainties of further litigation.

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein, it is agreed as follows:

1.  Class Action Status.
   A.  The representative plaintiffs and the City agree solely for purposes of this settlement and its implementation that the civil action shall proceed as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to the issues designated in paragraph 1.B below, but if such settlement fails to be approved by the district court or otherwise is not consummated, then the City shall retain its right to object to the maintenance of the civil action as a class action.
   B.  The representative plaintiffs and the City agree, subject to the limitations set forth in paragraph 1.A above, that the civil action shall be certified as a class action with respect to the issue of whether Ordinance No. 8148–A is constitutional under the First, Fourteenth and Fifteenth Amendments to the Constitution of the United States and acceptable under the statutory requirements of Section 2 of the Voting Rights Act of 1965, as amended, and the Civil Rights Act of 1871;  provided, however, that the civil action shall not be certified as a class action with respect to the issue of the constitutionality or statutory compliance of that part of Section 3 of Ordinance No. 8148–A which provides that the chairman and chairman pro-tem of the City Council must be selected from among the City Council members representing City Council districts 1, 2 or 3.

C. The representative plaintiffs and the City agree forthwith to take the following steps with respect to the class status of the civil action:

(1) request the district court to conditionally approve this Settlement Agreement;

(2) request the district court to order that notice be directed to members of the class advising them of the scheduling of fairness hearing to determine whether the proposed settlement is fair and adequate, and further advising them that any member who wishes to oppose the proposed settlement must file a written objection with the Clerk of the United States District Court at least 7 days prior to the date of the scheduled fairness hearing; and

(3) represent to the district court that the best notice practicable under the circumstances is notice by publication in *The Tampa Tribune* and *The Florida Sentinel Bulletin,* such notice to be published once a week for three consecutive weeks and the City bearing the cost of publication.

D. If, following the fairness hearing, the district court finds that the proposed settlement is fair and adequate, the representative plaintiffs and the City shall file a joint motion requesting the district court to certify the class with respect to the issues designated in paragraph 1.B above and a stipulation dismissing the civil action with prejudice.

2. Settlement Terms.

A. The representative plaintiffs, on behalf of themselves and the members of the class, shall:

(1) cooperate with the City in preparing and filing the motions and making the representations to the district court specified in paragraph 1.C above;

(2) participate actively in the fairness hearing and employ their best efforts to encourage the district court to approve the proposed settlement; and

(3) if the district court approves the proposed settlement, dismiss the civil action with prejudice.

B. The City shall:

(1) through its City Attorney, present to the City Council as an integral part of the settlement of the civil action an ordinance (copy attached hereto as "Exhibit B") amending the City's Revised Charter to provide that the chairman and chairman pro-tem of the City Council may be City Council members representing any City Council district; provided, however, the City Attorney shall not otherwise take a position concerning the merits of the amendment embodied in the ordinance;

(2) if the City Council passes the ordinance, through its Mayor, take all steps necessary to have the issue presented to the City's electors by referendum at the earliest practicable date; provided, however, that the Mayor shall not otherwise take a position concerning the merits of the amendment embodied in the ordinance;

(3) cooperate with the Hillsborough County Supervisor of Elections in developing and implementing programs designed to increase participation among black electors in City elections, including the following:

(a) a program to monitor the City's compliance with the statutory procedures for offering voting instructions to electors as specified in *Fla. Stat.* § 101.5611 (1985);

(b) a voter education program designed to reduce occurrences of overvoting in City elections;

(c) a voter education program through the City's public schools and civic organizations regarding the proper use of the City's votomatic equipment;

(d) a program of on-site voter registration in the City's high schools and institutions of higher education; and

(e) a program to analyze voter registration and turnout statistics in relation to the size of the City's electoral precincts.

3. Subsequent Litigation.

The representative plaintiffs agree that neither they nor any person, organization or other entity acting on their behalf will, subsequent to the dismissal of the civil action, file, charge or claim or cause to be filed, charged or claimed, any administrative complaint or

lawsuit against the City arising out of or relating to the subject matter of the civil action; provided, however, that this provision shall not prevent or limit the representative plaintiffs or other members of the class from filing a subsequent claim or lawsuit against the City arising out of or relating to that part of Section 3 of Ordinance No. 8148–A which provides that the chairman and chairman pro-tem of the City Council must be selected from among the City Council members representing City Council districts 1, 2 and 3.

4. <u>No Admission of Liability.</u>

The representative plaintiffs and the City agree that the execution of this Settlement Agreement by the City does not constitute an admission by the City that it has violated the Constitution of the United States or any law, statute, rule, regulation or ordinance of the United States, the State of Florida or any municipality.

5. <u>Waiver of Sanctions.</u>

The City agrees to waive and relinquish its right to receive all awards of sanctions that have been entered against the representative plaintiffs in the civil action, and the City shall take no steps to enforce such awards or collect the sums specified therein.

6. <u>Successors and Assigns.</u>

The rights and obligations of the City under this Settlement Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the City. The rights and obligations of the representative plaintiffs under this Settlement Agreement shall insure to the benefit of and shall be binding on each of them and their heirs, executors, administrators, successors and assigns, and each of them, jointly and severally.

7. <u>Merger.</u>

The representative plaintiffs and the City agree that this Settlement Agreement constitutes the entire agreement between them relating to the subject matter hereof, and fully supercedes any and all prior agreements or understandings between them pertaining to the subject matter hereof.

8. <u>Costs and Attorneys' Fees.</u>

The representative plaintiffs and the City agree that they shall each bear their own costs and attorneys' fees arising out of or relating to the civil action.

9. <u>Severability.</u>

The representative plaintiffs and the City agree that if any provisions of this Settlement Agreement should be held to be illegal or invalid by a court of competent jurisdiction, the legality and validity of the remaining provisions shall not be affected thereby and the illegal or invalid provision shall be severed from the remaining provisions and shall not be deemed a part of this Settlement Agreement.

10. <u>Voluntary Execution.</u>

The representative plaintiffs acknowledge that they have carefully read and fully understand all of the provisions of this Settlement Agreement and have thoroughly discussed all aspects thereof with their attorneys; that they are entering into this Settlement Agreement freely and voluntarily; and that neither the City nor any of its officials, agents, representatives or attorneys has made any representations concerning the terms or effects of this Settlement Agreement other than those set forth herein.

WHEREFORE, the representative plaintiffs and the City agree to all of the provisions contained herein.

DATED this 22nd day of January, 1988.

NAACP Special Contribution Fund

Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215–3297
Attorneys for Plaintiff
By: (s) Grover G. Hankins

Grover G. Hankins, Esq.

By: (s) Kaydell Wright–Douglas

Kaydell O. Wright–Douglas, Esq.

Carl Warren

CARL WARREN,
on behalf of himself and as a class representative.

(s) Albert Davis

ALBERT DAVIS,
on behalf of himself and as a class representative.

CARLTON, FIELDS, WARD,
EMMANUEL, SMITH, CUTLER &
KENT, P.A.
One Harbour Place
777 S. Harbour Island Drive
Tampa, Florida 33602
Attorneys for Defendants
By: (s) Peter W. Zinober

    Peter W. Zinober, Esq.

CITY OF TAMPA, FLORIDA,
on behalf of itself and its divisions,
agencies, officials, employees and other
representatives.

By: (s) Sandra W. Freedman

    Sandra W. Freedman, Mayor