Linda INGRAM, Kimberly Gray Orton, Elvenyia Barton–Gibson, and George H. Edding, Plaintiffs,

v.

THE COCA–COLA COMPANY, Defendant.

No. 1:98–CV–3679–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 7, 2001.

Cyrus Mehri, Pamela Coukos, Gouri Bhat, Mehri, Malkin & Ross, Washington, D.C., Jeffrey O. Bramlett, Homer L. Mixson, Joshua F. Thorpe, Steven J. Rosenwasser, Bondurant, Mixson & Elmore, Atlanta, GA, James E. Voyles, DeVille, Milhollin & Voyles, Marietta, GA, Robert L. Wiggins, Samuel Fisher, Byron R. Perkins, Gordon, Silberman, Wiggins & Childs, Birmingham, Alabama, for Settlement Class Counsel.

Robert Allan Boas, Elizabeth Finn Johnson, The Coca–Cola Company, William A. Clineburg, Jr., Larry Dean Thompson, Michael Wayne Johnston, Shelly Yvonne Sharp, King & Spalding, R. Lawrence Ashe, Jr., Paul Hastings, Janofsky & Walker, Fisher & Phillips, Jeffrey Emery Tompkins, Thomas, Kennedy, Sampson & Patterson, Atlanta, GA, for defendant.

Willie E. Gary, F. Shields McManus, Tricia P. Hoffler, Mary Ann Diaz, Gary, Williams, Parenti, Finney, Lewis, McManus Watson & Sperando, Stuart, Florida, Janet Hill, Hill, Lord & Beasley, Athens, GA, for objectors.

## *ORDER*

STORY, District Judge.

This case is before the Court on the motion of Settlement Class Representatives Ingram, Orton, Barton–Gibson and Eddings for final approval of the Settlement Agreement in this

action and certification of a Settlement Class of approximately 2200 African–American current and former salaried employees of The Coca–Cola Company. [302–1]. The Court, having conducted a Fairness Hearing and heard from the parties and the objectors, approves the settlement and certifies the Settlement Class for the reasons set forth in this Order.

### Procedural History

This case originally was filed as an individual discrimination action against The Coca–Cola Company ("Coca–Cola"), and an Amended Complaint was filed on April 22, 1999, containing class action allegations and adding additional plaintiffs, including Ingram and Orton. The Amended Complaint alleged that Coca–Cola systematically discriminated in promotions, compensation, and performance evaluations against salaried African–American employees. Pursuant to 42 U.S.C. § 1981, the Amended Complaint sought relief for the class including injunctive relief, back pay, compensatory and punitive damages, and attorneys' fees and costs. From April 22, 1999 until June 14, 2000, the parties engaged in extensive and highly contested discovery on class issues. In January 2000, plaintiffs filed a Second Amended Complaint, adding additional plaintiffs, including Barton–Gibson and Eddings, and adding class claims under Title VII of the Civil Rights Act of 1964.

Around the time that the Second Amended Complaint was filed, the Court ordered both sides to participate in non-binding mediation, without staying the litigation. Hunter R. Hughes was appointed by the Court to serve as the mediator. Mr. Hughes testified at the recent hearing that the parties engaged in vigorously contested settlement negotiations. Throughout the mediation, both sides continued with class discovery and the plaintiffs prepared their class certification motion. The parties ultimately reached a binding Settlement in Principle on June 14, 2001, the deadline for filing the class certification motion.

The parties were unable to reach agreement on the amount of back pay due the class and consented as part of the Settlement in Principle to participate in binding arbitration on back pay. A panel of neutral employment discrimination experts were to preside over the arbitration proceeding, and they would be assisted by a neutral labor economist. After reviewing the competing claims made by each side in light of prevailing law, the Panel issued a determination of the amount required for a make-whole back pay relief fund.

Following the conclusion of arbitration, the Court granted preliminary approval of the settlement, provisionally certified the Class Representatives and Class Counsel, and ordered notice to be sent to the class. Twenty-four individuals opted out of the class, and thirteen class members filed objections. Eleven objectors represented by the law firm of Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando ("the Gary Objectors") filed identical objections. Of the eleven Gary Objectors, four later withdrew their objections. On May 29, 2001, the Court held a hearing regarding the fairness of the Settlement Agreement. Parties and objectors were afforded the opportunity to present evidence and be heard prior to final approval of the settlement.

### Settlement Terms

The settlement provides the following relief to the class. Programmatic relief is far-reaching. First, the Settlement Agreement ("the Agreement") includes a Statement of Principle committing Coca–Cola to standards of excellence in "promoting and fostering equal opportunity." Next, Coca–Cola's Board of Directors is required to review and remain informed about the Company's progress toward achieving diversity goals; the Board's oversight responsibilities include considering the Company's EEO performance in determining whether or not Company officers have met their business objectives. Third, the Agreement creates an outside, independent task force ("the Task Force") to oversee Coca–Cola's compliance with the terms of the settlement. The Task Force's duties include evaluating the Company's existing human resources policies and practices, making recommendations for any necessary reforms and improvements of those policies and practices, monitoring

Coca–Cola's practices for the duration of its four year term, investigating complaints, and issuing written reports on Coca–Cola's progress in implementing the terms of the Settlement Agreement to the Board, Coca–Cola's CEO, Class Counsel, the Court, and the public. The Task Force's recommendations are binding on Coca–Cola unless the Company seeks and obtains judicial relief in a proceeding where it bears the burden of proof. The Task Force will have the services of Joint Experts, two industrial psychologists selected by the parties, who will review and critique Coca–Cola's existing policies and practices and issue a written report. Fourth and finally, Coca–Cola will hire an Ombudsperson to oversee investigations of complaints of discrimination and retaliation. These programmatic terms likely exceed what this Court could have required the Company to undertake if the class had prevailed at trial.

Second, the monetary benefits ensure a guaranteed recovery to every class member averaging approximately $38,000. Specifically, Coca–Cola will make payments to class members from a Back Pay Fund of over $24 million and a Compensatory Damages Fund of approximately $59 million. These funds will be distributed pursuant to an allocation formula developed by the class's expert, Dr. Janice Fanning Madden. A unique provision allows class members to decline their share of the determined back pay amount, opting to obtain an individual hearing before a United States Magistrate Judge. The class members requesting an individual hearing may keep their share of the Compensatory Damages Fund. In addition, the settlement creates a $10 million Promotional Achievement Award Fund that will pay bonuses to class members who obtain promotions over a ten year period. The settlement requires Coca–Cola to make pay equity adjustments to correct any existing race-based inequities, estimated by Class Counsel's expert to cost approximately $43.5 million over ten years. Attorney's fees and expenses of approximately $20.7 million are provided, and special compensation of the Class Representatives is included.

## Discussion

There is a strong judicial policy in favor of settlement, in order to conserve scarce resources that would otherwise be devoted to protracted litigation. *Bennett · v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984). Particularly given the tremendous benefits this settlement provides to the class, there is every reason to avoid the substantial burden of further litigation. Indeed, preventing the class from obtaining reforms and compensation for years, if at all, would be inappropriate. This settlement also fulfills the policies and purposes underlying the civil rights statutes at issue in this litigation by strengthening equal opportunity and promoting model voluntary measures to improve the workplace. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977)[1] (remarking that for Title VII cases, "the policy favoring settlement is even stronger in view of the emphasis placed upon voluntary conciliation by the Act itself").

Courts have developed a common test for settlement approval: whether the settlement is (1) fair, adequate and reasonable, and (2) not the product of collusion between the parties. *Cotton*, 559 F.2d at 1330 (5th Cir.1977); *Bennett*, 737 F.2d at 986. Under this test, the settlement merits approval.

## I. The Settlement Is Fair, Adequate and Reasonable.

In *Bennett v. Behring*, the Eleventh Circuit approved a district court's reliance on the following six factors in assessing the fairness of a class action settlement: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett*, 737 F.2d at 986. In

1. The United States Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (1981).

addition, the judgment of experienced counsel is relevant to approval. *See, e.g., Cotton,* 559 F.2d at 1330 (stating that trial court is "entitled to rely on upon the judgment of experienced counsel for the parties" in evaluating settlement); *see also Warren v. City of Tampa,* 693 F.Supp. 1051, 1055 (M.D.Fla. 1988), *aff'd* 893 F.2d 347 (11th Cir.1989); *In Re Motorsports,* 112 F.Supp.2d 1329, 1333 (N.D.Ga.2000); *Meyer v. Citizens and Southern Nat'l Bank,* 677 F.Supp. 1196, 1201 (M.D.Ga.1988). These factors strongly support approving this settlement.

## A. Likelihood of Success at Trial and Range of Potential Recovery

■ First, the benefit this settlement provides to the class, both in terms of injunctive and monetary relief, should be compared with the likely recovery for the class at trial. *Cotton,* 559 F.2d at 1330. This question implicates the first three of the *Bennett* factors, which are closely related: "(1) the likelihood of success at trial; (2) the range of possible recovery; and (3) the point on or below the range of possible recovery at which a settlement is fair, reasonable and adequate." *Bennett,* 737 F.2d at 986. This standard often justifies approving settlements that are substantial compromises of the relief that could be obtained through litigation. However, in this case, the result obtained under the settlement is consistent with and in some respects exceeds the relief that the class could expect to obtain at trial, while obviating the risks that further litigation entails.

The class would undertake significant risks by proceeding further with litigation. For instance, the class might not prevail on the threshold issue of class certification, either initially or on an inevitable appeal. Even if the class were certified, the class faces the risk of losing at Stage I of trial, where the class would bear the burden of proving that Coca–Cola engaged in a pattern and practice of discrimination. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). Success at Stage I would require making a successful case on statistical and anecdotal evidence, a case that Coca–Cola would certainly contest in a battle of experts. Even if class-wide liability were established, there is a substantial risk that some unknown number of class members would lose their Stage II hearings and receive no compensation at all. *See Teamsters,* 431 U.S. at 344, 97 S.Ct. at 1859 (noting that employer may challenge any particular individual's entitlement to recovery in Stage II proceeding). In general, plaintiffs face an uphill battle in prevailing on employment discrimination cases in federal court. Class Counsel submitted a report by Professor Stewart J. Schwab analyzing data on federal employment discrimination cases, and the report concluded that employment discrimination plaintiffs are much less likely than other types of plaintiffs to win their cases at trial and sustain their victories on appeal.[2] Class Counsel and the mediator attested to the substantial challenges facing class action plaintiffs in particular.

In light of these risks, it is significant that the settlement terms compare so favorably with what might be obtained at trial. With respect to the programmatic relief, the class has obtained a result superior to what could be ordered by the Court even after a successful trial establishing liability on every issue. The Court would be exceedingly reluctant in a contested proceeding to order a business to submit to an outside oversight panel such as the Task Force. Further, the Board of Directors reforms appear to be unique.

With respect to the monetary relief, the relief is consistent with what could reasonably be expected if the case were fully litigated. The back pay fund was actually litigated before an arbitration panel. The per class

2. Professor Schwab's data shows the following: only about 7% of all employment cases go to trial, and employees win only about one-fourth of those cases. (Rpt. of Prof. Stewart J. Schwab ("Schwab Rpt.") at 3–4.) This success rate is one of the lowest ones for plaintiffs in almost any category of cases. (*Id.* at 4.) If the employer appeals one of those rare plaintiff wins, the employer has a 44% chance of getting the verdict reversed. (*Id.* at 5.) By contrast, if an employee attempts to get an employer win reversed, the plaintiff has only a 5.8% chance of success, the worst plaintiff success rate of any category of cases except petitions for habeas corpus relief. (*Id.*)

member payments in the Compensatory Damages Fund are consistent with a reasonable trial recovery. In fact, the average per class member payments from the two funds under this settlement are more than six times what Professor Schwab determined to be the median verdict (including back pay, front pay, and compensatory and punitive damages) for plaintiffs in individual employment discrimination cases, once success rates are considered.[3] Further, the credible testimony of Class Counsel and the mediator establishes that the monetary benefit to the class compares favorably to the likely outcome of litigation. The monetary relief also includes unique benefits for class members that enhance its fairness. Under the formula for distribution to class members in this case, no class member is left uncompensated.[4] The approach in this case significantly lessens the burden on members of the class, who do not have to file and substantiate an individual claim.[5] The Settlement Agreement proposes a fair and reasonable means of allocating settlement payments, dividing the fund based on time at Coca–Cola. As explained by Dr. Madden in her report, this means of allocating the fund directs larger shares to those employees most likely to be under-compensated because of larger race-based pay disparities, taking into account factors such as education, experience and type of job. (Madden Rpt. at 3.) However, class members still have another option, which is to gain the benefits of an individual hearing on back pay under the Promotional Claims Procedure, while keeping a guaranteed compensatory damages payment. The Court finds the amount of the back pay fund and the formula distribution mechanism fair; the Promotional Claims Procedure, however, provides added protection for individual class members who believe they should obtain greater back pay recovery.

3. Prof. Schwab estimates that the value of a typical employment discrimination case that goes to trial, accounting for the risk of losing at trial and the risk of losing on appeal, is only $5,995. *See* (Schwab Rpt. at 5–6.)

4. Typically, employment discrimination cases, whether at Stage II of litigation or in a settlement context, are resolved by a claims procedure or individual hearings to determine each class member's entitlement to recovery.

Counsel for the Gary Objectors submitted reports from Dr. Robert Petersen and Donald Frankenfeld challenging Dr. Madden's report describing the Back Pay Fund allocation formula. However, none of the Gary Objectors challenged (1) the use of an allocation formula; (2) the use of any of the specific factors relied on by Dr. Madden to allocate back pay and disclosed in the Notice; or (3) Dr. Madden's failure to use any particular factor in this formula. The concerns raised by the objectors related to the total monetary relief provided by the settlement. The Petersen and Frankenfeld reports erroneously attempted to establish that Dr. Madden's formula understated the damages due to class members. As the Gary Objectors' counsel conceded at the Fairness Hearing, these reports relied on a basic misunderstanding of the purpose of Dr. Madden's report. Dr. Madden's report was not designed to determine the actual damages due to discrimination suffered by any particular Coca–Cola employee, but rather to develop a rational means of allocating the sum predetermined by the arbitration procedure among class members.

Comparing the relief obtained to the issues presented in the Second Amended Complaint, the class has achieved a reasonable result with respect to the major objectives of the litigation. The benefit of obtaining guaranteed relief, in the face of serious obstacles to successful litigation, enhances the value of the settlement to the class and strongly demonstrates its fairness.

## B. The Complexity, Expense and Duration of Further Litigation

The class obtained a significant benefit from the relatively rapid litigation and settlement of this case. The testimony of the

5. *Accord Roberts v. Texaco, Inc.,* No. 94 Civ. 2015(CLB) Mem. Decision at 4 (S.D.N.Y. March 21, 1997) (approving of the allocation of damages by formula "in order that the cost and uncertainty of separate hearings or trials to prove the damages of each Class member is obviated").

mediator, evidence submitted by Class Counsel, and the experience of the Court establish that cases such as this typically take years, if not decades, to resolve to judgment. *See Cotton,* 559 F.2d at 1331 (describing "length of time and expense which must be incurred before the dust of combat has finally settled"); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1168 (5th Cir.1978) ("[i]n the instant case, we encounter another judicial paleolithic museum piece") (case originally filed in 1966); *Hartman v. Duffey,* 88 F.3d 1232, 1234 (D.C.Cir.1996), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997) (noting that sex discrimination class action "appears before us on appeal for the third time" after "working its way up and down the system for nearly 20 years"). Indeed, a credible projection for litigating this case through class certification and Stage I and Stage II trials, not to mention multiple opportunities for appeal, is ten years from the date of filing. Each phase of litigation would entail substantial expert costs, attorney time, travel and deposition costs, and other expenses. Trial on the merits would require consideration of complex dueling statistical models. In short, the likely alternative to settlement now is lengthy, burdensome, and expensive litigation. Particularly given the strength of the relief, the added benefit of obtaining it now rather than years from now makes approval of this settlement in the best interests of the class.

### C. The Stage of Litigation at Which the Settlement Was Reached

In this case, although the time from filing to Settlement in Principle was a relatively quick fourteen months, the settlement was not achieved until both sides had engaged in extensive discovery and had fully developed important issues. The parties actively pursued numerous discovery-related motions and issues. The plaintiffs conducted discovery of Coca–Cola's human resources data-

base, took depositions of senior management officials and reviewed over 140,000 pages of documents related to the Company's employment policies and practices and diversity and EEO performance.[6] The mediation presentations and arbitration proceedings provided each side further information about the merits of the class claims and the strength of Coca–Cola's defenses. Class Counsel credibly attested to their ability to make a reasoned judgment about the merits of the case during settlement negotiations.

### D. The Judgment of Experienced Counsel

In a case where experienced counsel represent the class, the Court "absent fraud, collusion, or the like, should hesitate to substitute its own judgment for that of counsel." *Cotton,* 559 F.2d at 1330; *see also, e.g., Warren,* 693 F.Supp. at 1060 ("Court is affording great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation"). Given the qualifications of Class Counsel, which include substantial experience in class action and other complex litigation and employment discrimination cases, the Court has confidence in their collective judgment that the benefits of this settlement far outweigh the delay and considerable risk of proceeding to trial.

### E. The Substance and Amount of Opposition to the Settlement

Both the substance and amount of opposition to this settlement are small. The Court has carefully considered the contentions of the nine individuals who filed objections to the settlement.[7] Although the Court must review and address such objections, "this is not to say that the trial judge is required to open to question and debate every provision. of the proposed compromise." *Cotton,* 559 F.2d at 1331. The central question at issue

---

6. Indeed, the class took all the discovery required to file its motion for class certification, and in fact had that motion, its accompanying expert report, documents, deposition excerpts and affidavits at the courthouse ready to file the day the parties reached a Settlement in Principle.

7. While the number of objectors is "not controlling," *Cotton,* 559 F.2d at 1331, a relatively small number of objectors can be taken as "some indication that the class members as a group did not think the settlement was unfair." *Kincade v. General Tire & Rubber Co.,* 635 F.2d 501, 506 n. 4 (5th Cir.1981).

is not whether any particular provision could have been negotiated in a slightly different or marginally more favorable way. Rather, the Court must determine the fundamental fairness, adequacy, and reasonableness of the settlement, taken as a whole. While the Court may interpret provisions subject to dispute, it may not unilaterally rewrite the terms of the bargain struck between the parties. *Officers for Justice v. Civil Service Comm'n,* 688 F.2d 615, 630 (9th Cir.1981); *Domestic Air Transp.,* 148 F.R.D. 297, 313 (N.D.Ga.1993) (stating that district court cannot impose modifications on parties). None of the objections here are sufficient to overcome the basic fairness of the Settlement Agreement.

With respect to specific objections of the Gary Objectors, the Court has already ruled on Objections 1 and 2, which claim certain deficiencies in the Notice, rejecting these same claimed deficiencies and determining that the Notice not only meets but exceeds the requirements of due process. Objection 3 asserts that four former named plaintiffs in this action should receive compensation comparable to the Class Representatives in this case. These four individuals have opted out, are no longer parties to this action, and are pursuing individual claims. They are therefore not entitled to or eligible to participate in the benefits provided by this settlement. Objections 4 and 5 seek procedural modifications, including creation of subclasses and a so-called "parallel class action." There is no factual justification for these vague contentions and no explanation of how the Court would implement either of these concepts in the absence of anyone claiming to represent a subclass [8] or parallel class, anyone having filed or proposed an alternative class, or anyone presenting a request that the Court certify such classes. Any such request would of course have to satisfy the requirements of Rule 23. Objections 6, 7, 10, and 12 assert in varying respects that the monetary relief provided by the settlement is inadequate. As explained above, the monetary relief is fair, adequate, and reasonable. Further, any class member dissatisfied with the amount being paid under the Settlement Agreement had the opportunity to opt out and preserve the right to litigate individually. Objection 9 asserts a series of deficiencies with the programmatic relief in this case. The Court is not persuaded that any of these objections goes to the fundamental fairness of a settlement that provides such impressive programmatic benefits to the class. More importantly, these criticisms, along with Objection 11, wrongly presume that Coca–Cola will be free to disregard the terms of a binding and judicially-enforceable consent decree. Finally, Objection 13 filed by the Gary Objectors complains that Coca–Cola did not admit fault. While it is understandable that employees who feel they were discriminated against want such an admission, this desire does not warrant rejecting the important benefits provided under the settlement.

The Court is sympathetic to, but not ultimately persuaded by, the objections filed by Larry Jones to two aspects of the distribution of settlement proceeds. Jones argues that distribution of funds should take into account not only time as an employee of Coca–Cola, but an employee's "bridged service," or time spent working as a contractor for Coca–Cola while an employee of a separate company, prior to hire as an employee of Coca–Cola. Jones also argues that former employees should have additional time to exercise stock options granted under the settlement. The settlement requires former employees (except retirees) to exercise options within eighteen (18) months of settlement approval or termination, whichever is later, while current employees and retirees have a ten-year term for exercising their options. Neither of these objections warrants rejection of the Settlement Agreement or under-

---

8. The only supposed "conflicts" the objectors allude to—between employees who have signed releases and those who have not, and between current and former employees—are not conflicts and do not justify subclassing. Employees who have signed releases are not in "conflict" with those who have not. They are eligible to participate on equal footing in the settlement. Current employees are obtaining injunctive benefits that are not relevant to former employees, but these are not extra benefits for one group at the expense of another; rather they reflect complementary anti-discrimination remedies consistent with the goals of civil rights law and are a consequence of Coca–Cola's agreement to comply with such laws. In any event, the Class Representatives who negotiated the settlement included current and former employees.

mines its fundamental fairness, reasonableness, and adequacy.[9]

The Court has no power to require Coca-Cola to add money to the settlement but can only evaluate the overall fairness of the bargain struck by the parties. Since the compensatory damages fund is distributed solely on the basis of total time employed by Coca-Cola and time factors into the back pay calculations as well, counting bridged service time would directly decrease the amount class members who were never temporary workers would receive. This dilution is inappropriate given the legal theories at issue and the intent of the Settlement Agreement. The class action complaint in this case sought relief on behalf of those "employed by The Coca-Cola Company in salaried exempt and non-exempt positions" (the same individuals covered by the Settlement Class definition) for harms caused by the Coca-Cola employment policies and practices applicable to those individuals. The plaintiffs never asserted in their complaint the kind of legal theory that would hold Coca-Cola responsible for damages incurred by its temporary or contract workers, and the parties have demonstrated no intention to include such damages in the settlement funds paid under the Agreement.

With respect to the exercise time for stock options, the Settlement Agreement treats former employees more favorably than Company policy, which requires terminated employees to exercise stock options within six months after the date of termination. The fact that former employee class members do not have the same ten-year term as current employee class members is not fundamentally unfair.[10]

## II. The Settlement Is Not the Product of Collusion

■ The Court must consider whether there is any evidence the settlement was the product of collusion, by examining the negotiating process, to determine whether the compromise was the result of arms-length bargaining between the parties. *In Re Domestic Air Transp.*, 148 F.R.D. at 313; *Warren*, 693 F.Supp. at 1055. The Court had the opportunity to personally observe the conduct of the parties during the litigation of this case and to hear the testimony of the mediator. There is no doubt that this case has been adversarial, featuring a high level of contention between the parties throughout the litigation, the mediation and the arbitration and drafting of the Settlement Agreement. The fact that the entire mediation was conducted under the auspices of Mr. Hughes, a highly experienced mediator, lends further support to the absence of collusion. Indeed, it took all of Mr. Hughes's skill to mediate this settlement because it was so difficult to reach agreement between the parties. Parties colluding in a settlement would hardly need the services of a neutral third party to broker their deal. Further, the fee was negotiated separately from the rest of the settlement, and only after substantial components of the class settlement had been resolved. Counsel for the Gary Objectors suggested that the fact that the fee negotiation was not "the very last item on the table" shows collusion. Given all the facts and circumstances pointing to a true arms-length negotiation, and the testimony of the mediator, the fact that the fee was being discussed on the last day of negotiation but not the very last minute is not credible evidence of collusion. Moreover, this case is not one where Class Counsel will obtain a disproportionately large fee in relation to the size of the settlement and where the class will receive a limited or dubious benefit. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir.1998) (stating that

---

**9.** It should be noted that Jones conceded he never worked as a contract employee and has no bridged service time, and that the circumstances of his departure from the Company mean that he has the same ten-year period to exercise stock options paid under this settlement as current employees do. He thus lacks standing to raise these objections.

**10.** The objection filed by Edward C. Holloway protests that his individual settlement share is not adequate. Mr. Holloway is in the same position as every other class member, and he could have opted out and filed an individual case asserting his claims for these damages. Otherwise, he can take the funds payable under the settlement, or he can pursue his individual claims under the Promotional Claims Procedure. This set of options is fair.

courts should be cautious "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded").

## III. Class Representative Compensation

■ Linda Ingram, Kimberly Orton, Elvenyia Barton–Gibson and George Eddings have requested incentive awards of $300,000 each, to be paid out of the Compensatory Damages Fund. Such compensation would be in lieu of, not in addition to, the compensation they would otherwise receive as members of the class from the Compensatory Damages Fund and Back Pay Fund. No objection to this proposed compensation has been filed. "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *In Re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D.Ohio 1997) (citing cases). Such awards are justified when the class representatives expend considerable time and effort on the case, especially by advising counsel, or when the representatives risk retaliation as a result of their participation. *Id.* at 273; *See also In re Lease Oil Antitrust Lit.*, 186 F.R.D. 403, 449 (S.D.Tex.1999) (recognizing that class representatives were entitled to additional compensation for their time and effort).

Here, the Settlement Class Representatives have made a factual showing with respect to the services they provided to the class and the risks they incurred. A great deal of evidence has been presented to the Court regarding the unique and extraordinary contribution these four individuals made to the investigation, prosecution, and settlement of this case. That factual showing is bolstered by the testimony of Class Counsel and the mediator, who uniformly agreed that in no prior case within their experience had Class Representatives been as involved with the litigation as in this case. Of note is the fact that the four Class Representatives in this case directly participated in the mediation process and vigorously asserted the interests of the class, as Class Counsel and the mediator attested. Further, the Class Representatives took risks, bore hardships, and made sacrifices that absent class members did not. Significantly, the Class Representatives have agreed never to seek re-employment with Coca–Cola.

In addition to the services they have provided and the risks they have incurred, the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award. The Class Representatives have fulfilled both the class's interest in effecting fundamental change at Coca–Cola and its interest in receiving fair amends for injuries allegedly suffered while working for the Company. Rewarding such efforts creates the proper incentives for individuals to come forward and undertake the arduous efforts needed to challenge alleged discrimination on a class-wide level, thus fulfilling the policies and purposes underlying Title VII. The Court finds the requested awards are appropriate in light of the substantial services performed on behalf of the Class. The Court also finds that the affiant compensation of $3000 each is appropriate as a contribution to the litigation that entails risk and effort.

## IV. Attorneys' Fees

■ The settlement provides for approximately $20.7 million in attorneys' fees, representing approximately 20% of the total current cash settlement fund,[11] to be paid to

---

11. Under the settlement, the Company has agreed to current cash payments of approximately $103.5 million. This current cash settlement fund is comprised of the Compensatory Damages Fund (approximately $58.7 million); the Make-Whole Relief Back Pay Fund (approximately $24.1 million); and specified attorneys' fees (approximately $20.7 million). While attorneys' fees constitute 20% of these current cash payments, the fee percentage becomes much smaller as additional, future relief to the class is factored

in. For example, if the $10 million Promotional Achievement Award Fund, to be paid out to class members by the Company over a period of ten years, is included in the value of the cash payments, attorneys' fees drop to approximately 18%. Similarly, if one includes in the value of the cash payments the estimated $43.5 million in future pay equity adjustments, which will inure to class members over a period of years under the settlement, attorneys' fees drop to approximately 13%.

Class Counsel for work related to and arising out of this litigation, including all necessary monitoring of future compliance with the settlement during the life of the Consent Decree. In the absence of any evidence of collusion or detriment to the class,[12] the Court should give substantial weight to a negotiated fee amount, assuming that it represents the parties' " 'best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.' " *See Elkins v. Equitable Life Ins. Co.*, 1998 WL 133741 (M.D.Fla. Jan.27, 1998) (quoting *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 720 (5th Cir.1974), *overruled on other grounds, Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989)). This weight is particularly appropriate when, as here, no objection has been raised to the fee award and the amount of fees is entirely consistent with a reasonable fee award under the circumstances of the case. It is well-established that parties to a lawsuit may negotiate a settlement wherein the defendant makes a total cash payment encompassing both monetary relief and any liability for attorneys' fees. *See Evans v. Jeff D.*, 475 U.S. 717, 733, 106 S.Ct. 1531, 1540, 89 L.Ed.2d 747 (1986). Any such agreement as to fees, like any provision of a class action settlement, remains subject to district court approval. *See Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir.1980) ("A district court is not bound by the agreement of the parties as to the amount of attorneys' fees") (citation omitted).

*Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir.1991), established that attorneys' fees should be a reasonable percentage of a common fund created for the benefit of the class, and set a 25% recovery as an appropriate "benchmark." Nonetheless, the Eleventh Circuit indicated that this benchmark could be adjusted according to the circumstances of the case. *Id.* at 775. Numerous factors are relevant for determining court awarded stat-utory fees: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *overruled on other grounds, Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). The Eleventh Circuit has noted in *Camden* that several additional factors are pertinent for setting and evaluating percentage fee awards in common fund cases: (1) whether the settlement confers non-monetary benefits upon the class; (2) whether there are any substantial objections to the settlement terms or the fees request; (3) the economics involved in prosecuting a class action; (4) the time required to reach settlement; and (5) any additional factors unique to a particular case which may be relevant to the district court's consideration. 946 F.2d at 775.

The challenges inherent in this case support a high percentage fee award. For instance, an early motion to dismiss by Coca–Cola raised complicated issues related to the application of FED.R.CIV.P. 23 in civil rights cases. Moreover, a demanding arbitration process required extensive briefing of legal issues related to labor economics. Considering the *Johnson* factors, this case's facts substantiate claims that prosecuting this case required considerable time and labor, presented novel and difficult legal questions, and required a high level of legal skill. In addition, because so much work was required to resolve these issues, many of the attorneys

---

12. The evidence submitted by Class Counsel and the mediator demonstrates that attorneys' fees were negotiated separately, at arms-length, and without collusion. During negotiations, Class Counsel informed the mediator of the bases for Class Counsel's reasonable fees and expenses— including the approximate number of hours spent on the case, the results obtained, the risks undertaken and the initial undesirability of the case—and the Company agreed to pay these fees and expenses.

involved had to forego other employment to pour their energies into this lawsuit. Notably, counsel have achieved a superior result for the class, including both monetary and injunctive relief.

Furthermore, this litigation was considered highly undesirable at the outset, and counsel took a significant risk in taking the case. The high level of undesirability and risk that class action discrimination cases entail merit particular weight, since there is a corresponding public benefit in encouraging the private bar to devote resources to enforcing our nation's civil rights laws. *See Roberts v. Texaco*, 979 F.Supp. 185, 197 (S.D.N.Y.1997) ("... racial discrimination in the workplace [is] a class action concern that has not received the same focus as have, for example, securities and products liability class actions, although it implicates concerns of considerable public importance"). Historically, claims alleging systemic employment discrimination are difficult to win, and the undesirability of the type of litigation at issue is compounded by the fact that the defendant here is highly respected in the Atlanta area and possesses the financial resources to vigorously defend the action. Given the potential public policy impact of the settlement, counsel's undertaking of the risk of this litigation merits recognition in the fee award. Despite these obstacles, Class Counsel provided unique, professional, and high quality services to the class.

The additional factors adopted in the *Camden* case also support an upward adjustment from the 25% benchmark. First, the settlement confers unprecedented non-monetary benefits on the class in the form of programmatic changes within the Coca–Cola Company. Second, no objection to the fee award in the settlement agreement has been filed. Third, as discussed above, Class Counsel expended significant resources in prosecuting the class action, both in terms of out-of-pocket costs and thousands of hours of attorney time, with no guarantee the litigation would succeed. Finally, in contrast to many other similar civil rights actions, this case was brought to a swift and successful conclusion with consequent benefits to the class and the Court.

Under these circumstances, a high percentage fee award would be warranted. However, Class Counsel and Coca–Cola have negotiated a fee award that is well below the benchmark of 25% of the recovery appropriate in such a case. As such, the award is fair and reasonable.

■ As further support for the fee award, the Court notes that the fee would also be fair and reasonable under the lodestar approach, which considers the hours expended in prosecuting the case. According to affidavits submitted by co-lead counsel, more than 22,000 hours of professional service have been expended in relation to this case. Counsel estimate that the time expended results in a lodestar amount for this case of between $5.2 and $6 million. Moreover, class counsels' work is not complete. They must perform work related to distribution of the funds from the settlement, oversee the implementation of the programmatic relief, and take on the burden of monitoring compliance with the settlement terms. In similar cases, courts have used applied multipliers that range from less than two times the reasonable time charges to more than five times the reasonable charge. *See e.g. Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 197–98 (S.D.N.Y. 1997) (citing cases in which multipliers were used). Granting the requested fee award would be tantamount to applying a multiplier between 2.5 and 4 to the lodestar amount submitted by counsel. Using such a multiplier would be reasonable considering the factors outlined which support the proposed percentage fee award. The same factors would support application of a significant multiplier to the lodestar amount; nonetheless, counsel have only requested a fee equal to what would have been calculated by using only a mid-range multiplier. Hence, the Court finds that the negotiated fee award would also be reasonable under the lodestar approach.

## V. Class Certification

As part of the Settlement Agreement, the parties have consented to certification of a settlement class in this case. The Supreme Court's decision in *Amchem Prods. v. Windsor*, 521 U.S. 591, 621, 117 S.Ct. 2231, 2248,

138 L.Ed.2d 689 (1997), however, counsels that this Court should independently determine whether this case meets the requirements for class certification under FED. R.CIV.P. 23(a) and 23(b). The Supreme Court states, "Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed." *Id.* Under *Amchem,* manageability concerns are eliminated in the settlement class context, but the Court must address other aspects of Rule 23. 521 U.S. at 620, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of the rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.").

### A. Rule 23(a)

Rule 23(a) sets forth four prerequisites to maintenance of a class action:

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED.R.CIV.P. 23(a).

■ **Numerosity.** The class in this case is so numerous that joinder is impracticable. The class encompasses approximately 2200 people. (Aff. of Robert A. Boas [277–1].) This number is well beyond that which courts accept as satisfying the numerosity requirement. *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.) (citation omitted), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986) ("'more than 40 adequate'" to satisfy numerosity requirement).

■ **Commonality.** Questions of law and fact are common to the members of the class. The Eleventh Circuit has held that commonality exists where plaintiffs allege that company-wide policies and practices, including the company-wide use of subjective decision-making practices, discriminate against a class:

But Rule 23 does not require that all the questions of law and fact raised by the dispute be common.... Nor is it clear from the interrogatories that plaintiffs allege no policy of discrimination; indeed the "individual acts" they cite could very likely be manifestations of such a policy. Among plaintiffs, "[a]llegations of similar discriminatory employment practices, such as ... [the] use of entirely subjective personnel processes that operated to discriminate, would satisfy the commonality and typicality requirements of Rule 23(a)."

*Cox,* 784 F.2d at 1557 (citations omitted); *see Shores v. Publix Super Mkts., Inc.,* No. 95–1162–CIV–T–25, 1996 WL 407850, at *6 (M.D.Fla. Mar.12, 1996) ("Publix's policy of delegating hiring and promotion decisions to managers, who make those decisions on the basis of subjective criteria, is a common course of conduct. Plaintiffs' allegation that this course of conduct results in a discriminatory practice is adequate to meet the commonality requirement of Rule 23."). *See Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 292 (2d Cir.1999) (finding commonality for class claim that granting discretionary authority to supervisory employees resulted in pattern and practice of discrimination) *cert. denied,* 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000); *Shipes v. Trinity Indus.,* 987 F.2d 311, 316 (5th Cir.1993) (stating that allegations of similar discriminatory employment practices like using entirely subjective personnel processes that discriminate satisfy commonality requirement).

Here, the plaintiffs alleged that Coca–Cola maintains company-wide policies and practices governing compensation, promotions

and performance evaluations[13] and that Coca–Cola's common compensation, promotion and performance evaluation systems are subjective, discretionary and un-monitored.[14] Plaintiffs further alleged that such company-wide policies, practices and systems fostered a pattern and practice of race discrimination against African–American employees, under both a disparate treatment theory and a disparate impact theory.[15] The plaintiffs placed evidence in the record concerning these allegations, but the Court need not and does not resolve the merits of those allegations or Coca–Cola's defenses.

The salient point is that the questions of whether Coca–Cola maintains company-wide compensation, promotion, and performance evaluation policies and practices, whether these policies and practices are subjective, discretionary, and un-monitored, and whether these policies and practices constitute a pattern and practice of intentional discrimination or adverse impact against African–American employees are common questions.

Plaintiffs' intent to rely on statistical evidence to establish class-wide discrimination also raises common questions. For example, the questions of whether statistically significant disparities exist in Coca–Cola's compensation and promotion of African–American employees relative to white employees are questions of fact common to all class members. In addition, by their very nature, allegations that particular employment practices disparately impact a protected class present common questions. *Shores*, 1996 WL 407850, at *7.

■ **Typicality.** The claims of the Class Representatives are typical of the claims of the class. As set forth above, the Class Representatives' claims concerning Coca–Cola's alleged company-wide policies and practices establish typicality as well as commonality. *Cox*, 784 F.2d at 1557. The Class Representatives' claims are typical because those claims arise out of and involve application of the same allegedly subjective, discretionary, and un-monitored promotion,

compensation, and performance evaluation systems and the same alleged pattern and practice of discrimination as the claims of the other class members. *See Caridad*, 191 F.3d at 293 ("[F]or the seven named Plaintiffs who alleged that they were not promoted as the result of racial discrimination, the question of whether [the defendant]'s policy of delegating discretion to department supervisors to make subjective decisions regarding employee promotions is administered in a racially discriminatory manner or has a disparate impact on African–American workers is crucial to their claims, as well as to those of the proposed class."). As another court stated,

> Plaintiffs' claims are typical of the class where, as here, their claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. There is no requirement that the named plaintiffs each personally experience every difficulty outlined in the complaint. Rather, it is sufficient that the claims of the named Plaintiffs are substantially similar to the claims of the class.

*Shores*, 1996 WL 407850, at *7 (citations omitted); *see Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985).

Plaintiffs Barton–Gibson, Eddings, and Ingram each challenge Coca–Cola's promotion system and each allege that they have been subjected to a practice pursuant to which Coca–Cola provides managers with the discretion to fill available positions without fair and open competition. All four Class Representatives challenge the Company's compensation system, alleging that Coca–Cola permitted managers the discretion to pay them unfairly and to pay them less than similarly or less qualified white employees. Plaintiffs Barton–Gibson, Eddings, and Ingram also challenge Coca–Cola's performance evaluation system, alleging that their performance was judged by different standards than those applied to white employees. *See, e.g.,* (Sec-

---

**13.** (Second Am.Compl. ¶¶ 19–22.)

**14.** (*Id.* ¶¶ 4(a), 35), 46–55, 106, 110 (performance evaluation system); 4(b), 35, 60–73, 106, 110

(compensation system); 4(c), 35, 78, 84–93, 106, 110 (promotion system).

**15.** (*Id.* ¶ 6, Counts I–III; *see also id.* ¶¶ 3–5, 35.)

ond Am.Compl. ¶¶ 117–137, 153–169, 189–195.)

■ **Adequacy.** The Class Representatives in this case have fairly and adequately protected the interests of the Class. The Eleventh Circuit has stated that "[t]he adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir.1985) (citation omitted).

The record in this case establishes and the Court finds that Class Counsel are "qualified, experienced, and generally able to conduct the proposed litigation." Class Counsel vigorously and skillfully prosecuted this case on behalf of the class, both during the litigation and the mediation. Their representation of the class was more than adequate.

Furthermore, the Class Representatives do not have interests that are antagonistic to the class. Rather, they share common interests with the class in obtaining injunctive and monetary relief. As set forth above, the record reflects that Plaintiffs Ingram, Barton–Gibson, Eddings, and Orton served the class with distinction.

### B. Rule 23(b)

■ The parties have consented to certification, for settlement purposes only, of all claims for injunctive and equitable relief under Rule 23(b)(2) and to certification of claims for compensatory and punitive damages under Rule 23(b)(3). The Settlement Agreement provides that either side may present the Court with additional, alternative bases for certification. Plaintiffs urge the Court to certify the class: as a(b)(2) class with notice and opt out rights, following the approach outlined by the Eleventh Circuit in *Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir.1983); as a(b)(3) class; and as the agreed upon (b)(2)/(b)(3) hybrid. However-

er, the Court finds that certification is only appropriate as a (b)(2)/(b)(3) hybrid.

FED.R.CIV.P. 23(b)(2) permits certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." This subsection was expressly intended to apply to "actions in the civil-rights field where a party is charged with discriminating unlawfully against a class." Adv. Comm. Notes, 1966 Amendments to FED. R.CIV.P. 23. Although the language of the subsection contains no "predominance" requirement, the 1966 Advisory Committee Notes indicate that the provision "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *Id.* Absent class treatment, it is virtually impossible for employees to obtain company-wide injunctive relief. The changes to Coca–Cola's company-wide compensation, promotion, evaluation and other human resources policies that will result from the Settlement Agreement and will benefit class members would not have occurred if this controversy were pursued through individual actions.

FED.R.CIV.P. 23(b)(3) requires "that the questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

First, this case satisfies the predominance requirement because common questions, particularly the over-arching question of whether Coca–Cola engaged in a pattern and practice of race discrimination, predominate over individual questions.[17] The pattern and practice question predominates because it has a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief. Under the Supreme Court's decision in *Int'l Bhd. of Teamsters v. United*

---

17. As a practical matter, in light of the Settlement Agreement in this case, common questions obviously predominate over individual questions. *Amchem* however, establishes that the Court

must look beyond the terms of the Settlement Agreement in analyzing the predominance requirement of Rule 23(b)(3).

**700**

*States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977), which establishes the method of proof in this case, the question of whether Coca–Cola engaged in a pattern and practice of discrimination is a linchpin that connects the claims of all class members. A finding that Coca–Cola engaged in such a pattern and practice would create a presumption that the Company discriminated against every member of the class. 431 U.S. at 362, 97 S.Ct. at 1868; *see Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 599 (2d Cir.1986).

The opinion in *Rutstein v. Avis Rent–A–Car Sys., Inc.* (*"Avis"*), 211 F.3d 1228 (11th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1354, 149 L.Ed.2d 285 (2001), confirms that class employment discrimination cases in which *Teamsters* applies satisfy the predominance requirement of Rule 23(b)(3). The Eleventh Circuit conspicuously distinguished *Avis,* a "non-employment discrimination case" in which it reversed certification, 211 F.3d at 1239, from pattern and practice employment discrimination cases in which *Teamsters* applies. *See, e.g., id.* at 1237 (rejecting plaintiffs' argument because "the *Teamsters* rationale is particularly appropriate in employment discrimination cases"); *id.* at 1240–41 (rejecting notion that *Avis* eliminates disparate treatment class actions and stating, "[W]e find it appropriate to note, in conclusion, what this case is not about. This is not a case alleging employment discrimination."). *Avis* also distinguished *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999 (11th Cir.1997), as being outside the employment context and relying on an individualized method of proof that differs from the *Teamsters* approach. *See* 211 F.3d at 1234–35. *Teamsters* cases satisfy the predominance requirement because of "[t]he importance of a finding of class-wide discrimination in [subsequent] individual proceedings." 211 F.3d at 1237 n. 16. As *Avis* notes, in a *Teamsters* case, proof of a pattern and practice of discrimination (which is common, statistical proof) creates a presumption of discrimination and entitlement to relief on which every member of the class can rely. *Id.* at 1237 (citing *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 772, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), as holding that "a demonstration by the plaintiff class of the

existence of a discriminatory pattern or practice establishes a presumption that the individual class members had been discriminated against on account of race"); *id.* ("'Once purposeful discrimination against a class is proved, a presumption of an entitlement to back pay and individual injunctive relief arises with respect to the members of that class.'") (citation omitted); *id.* at 1238 n. 19.

*Avis* states that "[w]hether an issue predominates can only be determined after considering what value resolution of the class-wide issue will have in each class member's underlying cause of action." *Id.* at 1234. The decision recognizes that in an employment discrimination class action such as this one, resolution of the common pattern and practice issue fundamentally affects "each class member's underlying cause of action," (*id.*), by establishing a presumption of liability and entitlement to individual injunctive and monetary relief.

The Court thus finds predominance in accordance with *Amchem,* which counsels that (b)(3)'s predominance requirement focuses on the substantive aspects of class members' legal claims, rather than on the terms of a proposed settlement. In *Amchem,* the plaintiffs attempted to establish predominance almost entirely on the basis of common questions arising out of the settlement itself. 521 U.S. at 594, 117 S.Ct. at 2235–36. The plaintiffs argued that class members' common interests "in receiving prompt and fair compensation" under the settlement and in a determination of the settlement's fairness predominated over individual questions. *Id.* The Supreme Court found such settlement-based arguments for predominance insufficient because they did not "train[ ] on the legal or factual questions that qualify each class member's case as a genuine controversy." *Id.* (footnote omitted). The Court further found that common questions concerning the health hazards of asbestos would have little "significance" with respect to litigation of each class member's claim. *Id.* Here, the class meets (b)(3)'s predominance requirement precisely because of the "significance" of common issues under the substantive law governing each class member's claim of discrimination. The pattern and practice

question thus satisfies the predominance requirement of (b)(3).

*Avis* does not preclude certification of claims for damages in this employment discrimination action. First, in *Avis,* because of the absence of the *Teamsters* presumption, a finding that the defendant engaged in a pattern and practice of discrimination would have had no effect on each class member's claim for damages. 211 F.3d at 1239. Here, however, because of that presumption, proof that Coca–Cola engaged in such a pattern and practice would establish a necessary predicate for the recovery of damages—proof of intentional discrimination—for each class member. Second, in an employment discrimination case litigated under the *Teamsters* framework, bifurcated proceedings can be used to address any individual issues relating to damages. Third, in the context of this settlement, concerns about the management of individual issues are not relevant. Fourth, the Court has a sufficient record to determine that the amount and allocation of damages in this case are fair, adequate, and reasonable.

The Court further finds that a class action is the superior method for the fair and efficient adjudication of this controversy. Resolution of class members' claims for injunctive and monetary relief in this single class action is superior to resolution of this controversy through the filing of a host of individual actions. Class treatment is superior as a matter of efficiency, consistency, and ensuring that class members actually obtain relief. With regard to efficiency and consistency, class treatment permits the common adjudication of questions that would otherwise be litigated over and over and thus avoids duplicative proceedings and inconsistent results. *See Cox,* 784 F.2d at 1554 ("repeated litigation of the pattern and practice issue" would have "lamentable consequences for judicial economy and the finality and consistency of judgments"). Class treatment is also superior because it removes real barriers to class members obtaining relief. Absent class treatment, each employee would have to incur the difficulty and expense of filing an individual claim and would have to undertake the personal risk of litigating directly against his or her current or former employer. Many employees would likely be unable to bear such costs and risks.

The Court also addresses the four specific "matters" set forth in the text of Rule 23(b)(3). With respect to "the interest of members of the class in individually controlling the prosecution or defense of separate actions," each class member was provided the right to opt out and pursue an individual action; only twenty-four (24) members of the class (approximately one percent) chose to do so. Further, class members do not have strong interests in separately litigating the key question of whether Coca–Cola engaged in a company-wide pattern and practice of discrimination or in pursuing company-wide injunctive relief. With respect to "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class," only eight of the 2200 class members now have actions pending against the Company, and those plaintiffs are pursuing individual claims in which they do not seek any relief that would affect the remaining class members. The "desirability ... of concentrating the litigation of the claims in [this] forum" is clear. Coca–Cola is headquartered here, the majority of the class is here and this Court is familiar with the issues in the case. With regard to "the difficulties likely to be encountered in the management of a class action," the Settlement Agreement essentially eliminates any manageability issues.

Because this action alleged entitlement to both injunctive and monetary relief, the class does not fit squarely within either subsection (b)(2) or subsection (b)(3). However, courts have approved of (b)(2)/(b)(3) hybrid certification of employment discrimination claims. *Holmes,* 706 F.2d at 1158 n. 10 ("[It is] possible to create hybrids in given cases. Since in theory there should be no hard requirement that (b)(2) be mutually exclusive, and since subpart (c)(4)(a) allows an action to be maintained 'with respect to particular issues,' the fact that damages are sought as well as an injunction or declaratory relief should not be fatal to a request for a(b)(2) suit, as long as the resulting hybrid case can be fairly and effectively managed.")

(citation omitted); *Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 581 (7th Cir.2000) ("The district court could certify a Rule 23(b)(2) class for the portion of the case addressing equitable relief and a Rule 23(b)(3) class for the portion of the case addressing damages."); *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C.Cir.1997) (stating that district court may adopt hybrid approach under subsection (b)(2) and (b)(3)). A hybrid certification is the most appropriate method of certifying this class for settlement and the Court finds that the resulting hybrid class action can be effectively managed. The fact that the parties have agreed only to certification of this settlement class as a(b)(2)/(b)(3) hybrid lends support to the Court's conclusion.

### Conclusion

The Class Representatives' Motion for Approval of Settlement [302–1] is hereby **GRANTED.** The Settlement Agreement dated November 16, 2000 is hereby approved, and the Court certifies the following Settlement Class:

All African–American persons employed by Defendant Coca–Cola in salaried exempt and non-exempt positions (commonly referred to as "Associates" by Defendant) in the United States at any time from April 22, 1995, to June 14, 2000, including, but not limited to, current or former salaried employees of the Corporate Office, Coca–Cola USA, and Minute Maid.

This Settlement Class is certified as a hybrid pursuant to Fed.R.Civ.P. 23(b)(2) and 23(b)(3).

Plaintiffs Elvenyia Barton–Gibson, George H. Eddings, Jr., Linda Ingram and Kimberly Gray Orton are hereby designated as Settlement Class Representatives.

The following attorneys are designated as Settlement Class Counsel: Cyrus Mehri, Pamela Coukos and Gouri Bhat of Mehri, Malkin & Ross, PLLC; Jeffrey O. Bramlett, H. Lamar Mixson, Joshua F. Thorpe and Steven J. Rosenwasser of Bondurant, Mixson & Elmore, LLP; James E. Voyles of Deville, Milholin, Voyles & Wales; and Robert L. Wiggins, Samuel Fisher and Byron R. Perkins of Gordon, Silberman, Wiggins & Childs, PC. Messrs. Mehri, Bramlett and Mixson are hereby designated Co–Lead Counsel.